UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HERMAN C.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04278-SEB-DLP |
| | ) | |
| ANDREW M. SAUL Commissioner of the Social Security Administration, | ) ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Herman C. requests judicial review of the denial by the

Commissioner of the Social Security Administration ("Commissioner") of his

application for Social Security Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act and Supplemental Social Security Income ("SSI") under Title

XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d), and 1383(c)(3).[2] For

the reasons set forth below, the Undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Report and Recommendation.

[2] In general, the legal standards for both DIB and SSI claims are the same, however, separate, parallel statutes and regulations exist for each. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020). Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

## I.  PROCEDURAL HISTORY

On December 15, 2016, Herman filed his applications for Title II DIB and Title XVI SSI benefits. (Dkt. 7-6 at 2, 4, R. 205, 207). Herman alleged disability resulting from lower back pain and a burning sensation in his bilateral elbows. (Dkt. 7-4 at 5, 9, R. 108, 112). The Social Security Administration ("SSA") denied Herman's claim initially on January 17, 2017, (Id. at 2, 6, R. 105, 109), and on reconsideration on June 14, 2017. (Id. at 17, 20, R. 120, 123). On June 16, 2017, Herman filed a written request for a hearing, which was granted. (Id. at 27, R. 130).

On October 22, 2018, Administrative Law Judge ("ALJ") Allison Dietz conducted a hearing, where Herman and vocational expert Scott B. Silver appeared in person. (Dkt. 7-2 at 34, R. 33). On December 19, 2018, ALJ Dietz issued an unfavorable decision finding that Herman was not disabled. (Id. at 17-25, R. 16-24). On December 31, 2018, Herman appealed the ALJ's decision. (Dkt. 7-5 at 4-5, R. 202-03). On January 19, 2019, the Appeals Council denied Herman's request for review, making the ALJ's decision final. (Dkt. 7-2 at 2, R. 1). Herman now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

## II.  STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is disabled. To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520. (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Herman is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy*, 705 F.3d at 636 (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to her conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004).

The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.  BACKGROUND

#### A. Herman's Medical History

On January 7, 2017, Herman visited Dr. James Gatton of Pro Medical Midwest, LLC in Springboro, Ohio on behalf of the SSA for a consultative disability evaluation of his bilateral elbows. (Dkt. 7-8 at 6, R. 306). *See* 20 C.F.R. §§ 404.1519, 416.919 (establishing such consultative examinations for applicants seeking, respectively, DIB and SSI). During the evaluation, Herman explained that he began experiencing elbow pain about three to four years ago, and that the pain had progressively worsened. (Id). Herman explained that he was having difficulty "extending and flexing both elbows." (Id). Dr. Gatton's examination revealed that Herman walked with a normal gait and his major joints appeared normal without inflammation, swelling, or effusion, although the lateral aspects of both elbows were tender to palpation. (Id. at 7, R. 307). Specifically, Dr. Gatton noted that Herman had normal bulk and tone of all major muscle groups; 5/5 strength in the upper and lower extremities in both proximal and distal muscle groups except for decreased strength in bilateral elbow flexion and extension; muscle stretch reflexes were 2+ and symmetrical throughout; and the examination revealed no pathological reflexes.

(Id). Dr. Gatton also noted that Herman was without limitation in the cervical and lumbar spine and upper and lower extremities; his fine fingering and gross gripping were normal on both sides; and that Herman could extend and flex both elbows fully, but the motion was severely slowed. (Id). Dr. Gatton found Herman should be able to walk for two out of eight hours in a day; that he probably could carry less than ten pounds frequently and that he could not carry more than ten pounds on occasion. (Id).

On that same day, January 7, 2017, Herman also visited Dr. William Drew at the Dearborn County Hospital in Lawrenceburg, Indiana for a consultative radiological examination of his lumbar spine. (Dkt. 7-8 at 2, R. 302). Dr. Drew's impressions included a finding of degenerative disc disease in Herman's lumbar spine, predominantly at L3-4 and L4-5, with alignment abnormalities. (Id). Dr. Drew further suspected nondisplaced unilateral spondylolysis[3] at L5. (Id).

On January 12, 2017, Dr. Brill, a state agency physician, found that Herman had one or more severe medically determinable impairments, including dysfunction of major joints and disorders of the back (discogenic and degenerative). (Dkt. 7-3 at 5, R. 68) Dr. Brill completed a Physical Residual Functional Capacity Assessment for Herman's Title II DIB claim noting several exertional limitations. (Id. at 6, R. 68-69). Dr. Brill found that Herman could occasionally lift and/or carry twenty pounds;

---

[3] Spondylolysis is a stress fracture through the pars interarticularis of the lumbar vertebrae. The pars interarticularis is a thin bone segment joining two vertebrae. It is the most likely area to be affected by repetitive stress. This condition is fairly common and is found in one out of every twenty people. *Spondylolysis*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/spondylolysis (last visited September 2, 2020).

frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight hour workday; sit for a total of six hours in an eight hour workday, and push and/or pull for an unlimited time. (Id). When identifying Herman's postural limitations, Dr. Brill found that he was limited to occasionally climbing ramps, stairs, ladders, ropes, and scaffolds. (Id). Dr. Brill also found that Herman's postural limitations were limited to occasionally needing to balance, bend at the waist, kneel, bend at the knees, and crawl. (Id). Dr. Brill found no manipulative, visual, communicative, or environmental limitations. (Id. at 6-7, R. 69-70). Based on the medical evidence, including Dr. Gatton's opinion, the RFC, Herman's age and education, Dr. Brill determined that Herman was not disabled. (Id. at 7-8, R. 70-71). Based on his RFC, Dr. Brill found that Herman could engage in light work. (Id. at 8, R. 71).

A few days later, on January 15, 2017, Dr. Brill completed a Physical Residential Functional Capacity Assessment for Herman's Title XVI disability claim and found the same exertional limitations as those noted on the January 12, 2017 DIB examination. (Id. at 14, R. 77). Dr. Brill did, however, adjust Herman's postural limitations to include frequently climbing ramps and stairs; occasionally climbing ladders, ropes, and scaffolds; frequently balancing, stooping (i.e., bending at the waist), kneeling, crouching (i.e., bending at the knees), and crawling. (Id. at 14-15, R. 77-78). All remaining limitations remained the same. (Id). Given Herman's age, education, medical evidence, and RFC finding, Dr. Brill determined that Herman was not disabled, and able to perform light work. (Id. at 15-16, R. 78-79).

8

On February 24, 2017, Herman presented to Meridian Health Services in Rushville, Indiana to address his back pain and pain in his bilateral elbows. (Dkt. 7-8 at 22, R. 322). Dr. Scott Marsteller completed a physical examination, which revealed posterior tenderness and a paravertebral muscle spasm, along with pain upon hyperextension of the back and spine. (Id. at 23, R. 323). Dr. Marsteller further noted that Herman was experiencing tenderness over his elbow and pain with wrist extension. (Id). Dr. Marsteller prescribed Meloxicam, Tramadol, and Tylenol to address Herman's pain, and ordered an x-ray of Herman's lumbar spine and elbow. (Id. at 24, R. 324).

On March 24, 2017, Herman visited Meridian Health Services complaining of lower back pain and bilateral elbow pain aggravated by lifting. (Dkt. 7-8 at 17, R. 317). Dr. Marsteller conducted a physical examination, which revealed results similar to Herman's last physical: posterior and paravertebral muscle insertion tenderness, a paravertebral muscle spasm, and pain upon hyperextension in Herman's spine. (Id. at 20, R. 320). Herman was still experiencing elbow tenderness, which worsened with extension at the wrist. (Id). Dr. Marsteller ordered an x-ray of the spine and elbow, reviewed Herman's prescriptions, (Id. at 19, R. 319), and prescribed Hydrocodone. (Id. at 19-20, R. 319-20). Further, Dr. Marsteller noted that he would refer Herman to orthopedics after Herman obtained insurance. (Id. at 17, R. 317).

On April 21, 2017, Herman underwent an x-ray examination of his lumbar spine at Rush Memorial Hospital in Rushville, Indiana. (Dkt. 7-8 at 26, R. 326). Dr.

Tyler Fredenburg noted that the x-ray revealed no vertebral anomalies; mildly calcified abdominal aorta; mildly exaggerated lumbar lordosis; no significant spondylolisthesis; degenerative disc disease changes in the lower thoracic spine; multilevel degenerative disc disease in the lumbar spine primarily from L3 through L5; no visualized acute fracture; chronic remodeling of superior endplate on L3; and facet hypertrophy in the lower lumbar spine. (Id). Dr. Fredenburg's impressions noted degenerative disc disease and facet hypertrophy in the lower lumbar spine. (Id). An x-ray of Herman's right and left elbows revealed no acute displaced fracture; no significant soft tissue swelling; normal alignment of the bones; and no fat pad displacement or evidence of elbow effusion. (Id. at 27-28, R. 327-28). Dr. Fredenburg's impressions of Herman's elbows noted no visualized acute bony abnormality. (Id. at 27, R. 327).

Later that same day, Herman also visited Dr. Marsteller for a follow-up appointment to address his lower back and bilateral elbow pain. (Dkt. 7-8 at 37, R. 337). Dr. Marsteller prescribed Gabapentin and Tizanidine to address the pain in Herman's back, and Voltaren, a topical gel, for Herman to apply to both elbows. Dr. Marsteller also recommended that Herman participate in physical therapy and pain management. (Id).

On June 2, 2017, Herman visited Dr. Reed Hoyer at the Rush Memorial Hospital Orthopedics Clinic for an evaluation and treatment of his bilateral elbow pain. (Dkt. 7-8 at 30, 32, R. 330, 332). During the visit, Herman reported approximately three years of fairly constant pain to the lateral aspect of both elbows

that was exacerbated by lifting. (Id. at 32, R. 332). Herman also notified Dr. Hoyer

that he had attended physical therapy in the past, but his condition had not

improved. (Id). After an examination of Herman's upper extremities, Dr. Hoyer noted

that Herman had full active elbow motion bilaterally; full bilateral forearm rotation;

bilateral elbow tenderness; and no real pain with resisted elbow extension. (Id. at 34,

R. 334). Dr. Hoyer diagnosed Herman with bilateral lateral epicondylitis[4] and

administered bilateral common extensor tendon origin injections. (Id. at 31, 35, R.

331, 335). Dr. Hoyer encouraged Herman to return if his symptoms did not improve,

and Herman agreed with this plan. (Id. at 35, R. 335).

On June 8, 2017, Herman visited Physical Therapist Assistant Tonia Biehl at

Rush Memorial Hospital for a physical therapy session. (Dkt. 7-8 at 56, R. 356). In

regard to his tennis elbow, Herman explained that he had received an injection and

was not experiencing any tingling or numbness. (Id.) He also explained that he had

received an injection to address the lateral epicondylitis. (Id). Herman did, however,

express that he was still suffering from lower back pain at a 6/10 and that he felt as

though something was "pushing on his low back." (Id). During her evaluation of

Herman's physical capabilities, Assistant Biehl noted that Herman suffered from

back pain and a stiff trunk and neck. (Id). During the session, Assistant Biehl

engaged Herman in two therapeutic exercises which included stretching and

endurance exercises. (Id. at 57, R. 357), and one manual therapy activity which

---

[4] Lateral epicondylitis, commonly known as tennis elbow, is swelling of the tendons that bend your wrist backward away from your palm. *Lateral Epicondylitis (Tennis Elbow),* https://www.hopkinsmedicine.org/health/conditions-and-diseases/lateral-epicondylitis-tennis-elbow (last visited September 2, 2020).

involved soft tissue mobilization treatment to increase his circulation, decrease his muscle tightness, reduce his pain, and increase his flexibility for functional mobility and activities. (Id). Assistant Biehl concluded that Herman's excessive lumbar and thoracic muscle tightness was contributing to his back pain and stiff trunk; that his excessive hamstring tightness was due to his limited hip flexion [range of motion]; and that Herman was experiencing tenderness in his piriformis muscles bilaterally. (Id. at 57, R. 357). Assistant Biehl also noted that Herman was unable to tolerate more than five minutes on the NuStep recumbent cross trainer due to back pain. (Id).

Even though Herman reported no change in his level of back pain following the session, Assistant Biehl noted that he was moving with decreased trunk stiffness. (Dkt. 7-8 at 57, R. 357). Based on her observations and assessment, Assistant Biehl developed a treatment plan for Herman which included a home exercise program. (Id. at 58, R. 358). During the post session, Assistant Biehl educated Herman on the home exercise program and stressed the importance of following this plan to see improvement. (Id). On June 9, 2017, Herman declined to continue participating in physical therapy sessions due to severe pain, (Id. at 55, R. 355), and requested discharge from sessions on June 23, 2017. (Id. at 66, R. 366).

On June 13, 2017, state agency physician Dr. Joshua Eskonen, completed a Physical Residual Functional Capacity Assessment for Herman's Title II DIB and Title XVI claims at the reconsideration level. (Dkt. 7-3 at 25, 35-36, R. 88, 98-99). Dr. Eskonen found that Herman could occasionally lift and/or carry twenty pounds; that

he could frequently lift and/or carry ten pounds; that he could stand and/or walk for a total of six hours in an eight-hour workday; sit for about six hours in an eight-hour work day; and that he was unlimited in his ability to push and/or pull. (Id. at 25-26, R. 88-89). Dr. Eskonen determined that Herman's postural limitations included frequently climbing ramps and stairs; occasionally climbing ladders, ropes, and scaffolds; frequently balancing, stooping, kneeling, crouching, and crawling; with no manipulative, visual, communicative, or environmental limitations. (Id. at 26, 36, R. 89, 99). Based on Herman's age, education, medical evidence, and RFC, Dr. Eskonen determined that Herman was not disabled, and able to perform light work. (Id. at 26-28, 36-38, R. 89-91, 99-101).

On July 19, 2017, Herman visited Dr. Marsteller at Meridian Health Services to address bilateral elbow and back pain. (Dkt. 7-9 at 9, R. 374). Dr. Marsteller recommended that Herman continue using his bilateral tennis elbow strap for the lateral epicondylitis and that he follow up with his pain management team to address his back pain. (Id). Dr. Marsteller refilled Herman's Voltaren topical gel and Meloxicam prescriptions. (Id. at 11, R. 376).

On January 30, 2018, Herman presented to the Fayette Regional Health System Pain Management Center in Connersville, Indiana for a follow-up concerning bilateral joint injections that he had received on January 3, 2018. (Dkt. 7-10 at 5, R. 395). During the appointment, Herman informed Dr. Danielle Turnak, his pain management specialist, that he had not experienced a huge change in his pain and that he was excessively stiff. (Id). Herman explained that "one day he had some

shooting pains in his legs, but it was only that one day." (Id). Dr. Turnak noted that even though the MRI showed no nerve impingement, Herman still experienced back pain. (Id). Dr. Turnak observed that Herman held himself stiffly during the physical examination; that he had a positive straight leg raise on the right and negative on the left; and that his strength was equal and symmetric. (Id. at 6, R. 396). Dr. Turnak assessed Herman with chronic low back pain, facet disease, lumbar spondylosis, and a possible component of radiculitis. (Id). Dr. Turnak increased Herman's Neurontin (Gabapentin) prescription, replaced his Zanaflex with Baclofen, and recommended that Herman undergo an epidural steroid injection. (Id. at 5-6, R. 395-96).

On February 22, 2018, Herman visited Dr. Marsteller at Meridian Health Services and explained that he received injections that helped his elbow for a while, but that he was continuing to experience elbow and back pain. (Dkt. 7-9 at 3, R. 368). During the visit, Herman explained Dr. Turnak's pain management plan to Dr. Marsteller and his hesitation of going forward with an epidural steroid injection. (Id). Dr. Marsteller recommended that Herman continue with the pain management plan for his lower back and that Herman try Lidocaine patches for his tennis elbow. (Id. at 5, R. 370). Dr. Marsteller reviewed Herman's medications, stopped Meloxicam, Tizanidine, Tylenol, and Voltaren, but refilled Herman's Gabapentin prescription. (Id. at 6-7, R. 371-72).

On May 2, 2018, Herman visited Dr. Turnak at the Fayette Regional Health System Pain Management Center to receive the epidural steroid injection for his

14

lower back. (Dkt. 7-10 at 14, 20, R. 404, 410). Prior to receiving the injection, Herman described aching pain and rated his pain level at an 8-9 out of 10; post injection, however, he described his pain level at a 6. (Id). Dr. Turnak continued Herman's prescriptions for Meloxicam and Tizanidine. (Id. at 10, R. 400).

On May 16, 2018, Herman visited the Fayette Regional Health System Pain Management Center for a follow-up appointment from his lumbar epidural steroid injection. (Dkt. 7-10 at 26, R. 416). During the visit, Dr. Turnak noted that although Herman was sleeping "better than he had in a long time with his back" and "did not have any pain going down his legs," he was, however, experiencing facet pain in his lower back. (Id). To treat this area, Dr. Turnak wanted to try medial branch blocks and radiofrequency ablations. (Id). Dr. Turnak assessed Herman with lumbar spondylosis, facet joint pain, and chronic low back pain. (Id). During the post session, Dr. Turnak encouraged Herman to quit smoking; refilled his prescriptions for Ultram (Tramadol), Neurontin (Gabapentin), and Mobic (Meloxicam); and advised him of the risks with the new treatment plan. (Id).

On August 15, 2018, Dr. Turnak performed the medial branch block procedure on Herman's lower back at the Fayette Regional Health System Pain Management Center. (Dkt. 7-10 at 50, R. 440). Herman tolerated the procedure well. (Id).

On June 24, 2019, Herman visited the Whitewater Valley Rehabilitation Center in Richmond, Indiana for a physical therapy initial evaluation to address right shoulder pain that he had been experiencing for three to four months.[5] (Dkt.

---

[5] The Whitewater Valley Rehabilitation Center medical record, provided by Herman's attorney, indicates that the report consists of two pages. The second page was not provided to the Court.

7-2 at 33, R. 32). Herman had been diagnosed with tendonitis, and reported functional difficulties with sleeping, dressing, lifting and carrying, reaching overhead, pushing and pulling, reaching behind his back, grooming, reaching forward, reaching across to his other shoulder, household chores, and doing yard work. (Id). Testing revealed that Herman was "positive for impingement and RC/biceps tendonitis" and that his biceps were tender upon palpation. (Id).

### B. Factual Background

Herman was fifty years old as of his alleged onset date of July 17, 2014. (Dkt. 7-2 at 38, R. 37). He has a tenth-grade education. (Dkt. 7-7 at 4, R. 230). He reported previous self-employment and relevant past work as a cement mixer, floor buffer, machine operator, and pallet loader and stocker. (Id).

### C. ALJ Decision

In determining whether Herman qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520(a) and 416.920(a) and concluded that Herman was not disabled. (Dkt. 7-2 at 18-20, R. 17-19). At Step One, the ALJ found that Herman had not engaged in substantial gainful activity since his alleged onset date of July 17, 2014. (Id. at 19, R. 18).

At Step Two, the ALJ found that Herman suffered from the following severe impairments: major dysfunction of the joints, specifically, bilateral elbows, and disorders of the spine, specifically, the lumbar spine. (Dkt. 7-2 at 20, R. 19).

16

At Step Three, the ALJ found that although Herman suffered from severe impairments, the impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (Dkt. 7-2 at 20, R. 19).

After Step Three but before Step Four, the ALJ found that Herman had the residual functional capacity ("RFC") to "perform light work," as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations:

- Occasionally climbing ramps and stairs;

- Never climbing ladders, ropes or scaffolds;

- Occasional balancing on uneven terrain and slippery surfaces;

- Occasionally stoop, kneel, couch, and crawl;

- No exposure to extreme cold, vibration/vibrating tools, unprotected heights or moving mechanical parts;

- A sit/stand option, at-will, at the workstation that would not take him off task more than 10% of the workday; and

- Limited to frequent reaching in all directions bilaterally, frequent handling/fingering bilaterally, and frequent pushing/pulling with the bilateral upper extremities.

(Dkt. 7-2 at 20, R. 19).

The ALJ determined, at Step Four, that Herman could not perform his past work as a wire harness assembler, truck driver helper, floor technician, or concrete

mixing plant laborer because of the assessed RFC. (Dkt. 7-2 at 23, R. 22). At Step Five, the ALJ determined that, considering his age, education, work experience, and RFC, Herman could perform the jobs of inspector/hand packager, routine clerk, and collator. (Id). Accordingly, the ALJ determined that Herman was not disabled under the Act. (Id).

## IV. ANALYSIS

At the outset, the Court notes that many of the Plaintiff's arguments for remand are both undeveloped and unclear. It is not for this Court to develop the Plaintiff's arguments or comb through the record to find support. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (explaining that it is not the court's "responsibility to research and construct the parties' arguments") (internal quotations omitted); *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (finding perfunctory and undeveloped arguments forfeited). Thus, this Court will only address specific issues raised in the Plaintiff's opening brief and will not speculate as to possible additional arguments that the Plaintiff was attempting to make.

The Plaintiff appears to challenge the ALJ's decision on two main grounds: the ALJ's RFC determination and the ALJ's credibility determination. The Court will address each argument in turn.

### A. RFC Determination

The Plaintiff contends that the ALJ failed to draw an accurate and logical bridge between her RFC determination and the evidence in the record. (Dkt. 10 at 5). When determining Herman's RFC at Step Four, the ALJ was required to conduct a

function-by-function administrative assessment of what work-related activities Herman could perform despite his limitations. *Young*, 362 F.3d at 1000-01. The RFC is assessed based on all relevant evidence in the record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). This relevant evidence includes medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. SSR 96-8p, 1996 WL 374184 *5 (July 2, 1996).

As noted above, the ALJ in this case concluded that Herman had the RFC to perform light work. 20 C.F.R. § 404.1567(b) provides the definition for light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The Plaintiff first argues that the ALJ erred when she rejected the opinion of Dr. Gatton, the consultative examiner who examined Herman on January 7, 2017. (Dkt. 10 at 6). Plaintiff argues that if the ALJ had accepted Dr. Gatton's findings that Herman "should be able to walk for two out of eight hours in a day" and that he

"probably could carry less than ten pounds frequently and could not carry more than ten pounds on occasion," the ALJ would have found a sedentary RFC. (Dkt. 10 at 5-6; Dkt. 7-8, at 7, R. 307).[6] In response, the Commissioner asserts that Dr. Gatton's opinion was unsupported by the medical evidence, and the ALJ provided a logical bridge for attributing little weight to this opinion and finding that Plaintiff retained the RFC to perform light work. (Dkt. 16 at 15-16). Plaintiff's reply brief reiterates his argument that it was error for the ALJ to limit Plaintiff to light, rather than sedentary work, and asserts that the ALJ's RFC determination is unsupported. (Dkt. 17 at 1).

Dr. Gatton examined the Plaintiff on January 7, 2017. During the examination, Dr. Gatton noted that Herman walked with a normal gait without the use of an assistive device. (Dkt. 7-8 at 7, R. 307). He further noted that Herman was able to get off and on the examination table without assistance. (Id. at 6, R. 306). He found that Herman had a normal range of active mechanical range of motion. (Id. at 5, R. 305). In addition, Dr. Gatton explained that Herman had a normal range of motion in the lumbar and cervical spine and his upper and lower extremities; that Herman could slowly extend and flex both elbows fully; and that his fine fingering and gross gripping were normal. (Id. at 7, R. 307). Dr. Gatton noted that all of Herman's major joints appeared anatomically normal without evidence of inflammation, swelling, or effusion. (Id). Dr. Gatton pointed out that Herman had

[6] Sedentary work involves sitting, occasional walking and standing, and lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a).

normal bulk and tone of all major muscle groups and 5/5 muscle strength for the most part. (Id). Dr. Gatton noted, however, that Herman's muscle strength decreased in his bilateral elbow flexion and extension. (Id). He also noted tenderness to palpation on the lateral aspect of Herman's elbows. (Id). Dr. Gatton ultimately opined that Herman "should be able to walk for two out of eight hours in a day [and] . . . probably could carry less than ten pounds frequently and could not carry more than ten pounds on occasion." (Id). The ALJ assigned little weight to this opinion. (Dkt. 7-2 at 21, R. 20).

The ALJ provided two reasons for discounting Dr. Gatton's opinion: (1) Dr. Gatton's examination findings did not support his assessment that Herman was experiencing significant physical limitations; and (2) his opinion was inconsistent with the record as a whole. (Dkt. 7-2 at 21, R. 20). First, as the ALJ pointed out, Dr. Gatton's findings do not point to or identify any diagnostic testing, clinical findings, or otherwise explain why Herman's impairments would cause him to only be able to walk for two hours in an eight hour day or occasionally lift ten pounds. There is nothing from the notes from Dr. Gatton's one-time physical examination that would suggest that Herman is in any way limited in his ability to lift, pull, or push. Without any diagnostic test or findings, Dr. Gatton's opinion that Herman should be limited in his walking and lifting is conclusory and unsupported by the medical evidence. Significantly, Herman has also failed to cite to anything in the record which would support Dr. Gatton's conclusion as to his physical limitations. Without

significant findings or symptoms in Dr. Gatton's own examination notes, the ALJ did not err in discounting Dr. Gatton's opinion.

In addition, the ALJ appropriately observed that Dr. Gatton's opinion was inconsistent with the record as a whole, including the opinions of state reviewing physicians, Drs. Brill and Eskonen. These state agency medical consultants concluded that Herman could perform light work. (Dkt. 7-2 at 22, R. 21). The ALJ found these opinions to be supported by the objective evidence in the record.

Assessing the medical evidence, the ALJ pointed out that in February 2017, Herman began treatment with Dr. Marsteller to address his complaints of back pain and bilateral elbow pain. Dr. Marsteller found tenderness over the lumbar area, pain with hyperextension of the lumbar spine, a positive straight leg raise test, and pain with wrist extension. (Dkt. 7-8 at 22, R. 322). Dr. Marsteller started Herman on pain medications and referred him for x-rays of the spine and elbow in April 2017. The x-ray examination revealed no vertebral anomalies; no significant spondylolisthesis; degenerative disc disease and facet hypertrophy in the lower lumbar spine. (Dkt. 7-8 at 26, R. 326). The x-ray findings of Herman's elbows, however, were unremarkable. (Dkt. 7-2 at 21, R. 20; *see* Dkt. 7-8 at 26-28, R. 326-28). Dr. Marsteller prescribed Herman pain medication for his back and a topical gel for his elbows (Dkt. 7-8 at 37, R. 337).

In June 2017, Herman visited Dr. Hoyer for an evaluation and treatment of his bilateral elbow pain. Dr. Hoyer diagnosed Herman with tennis elbow and administered cortisone injections. (Dkt. 7-8 at 35, R. 335). In keeping with his

treatment plan, Herman attended a few physical therapy sessions, but requested to be discharged without meeting the medical objective goals. (Id. at 66, R. 366). The ALJ properly found that the objective evidence demonstrates that Herman had some limitations, but "not to such a degree that he is prevented from performing work at the light exertional level with limitations that take into account his back pain, including the need for a sit/stand option, asthma, and bilateral elbow dysfunction." (Dkt. 7-2 at 22, R. 21). In so finding, the ALJ incorporated Herman's functional limitations into the RFC, thus building a logical bridge from the medical evidence to her conclusion to add a "sit/stand option, at will," and limiting Herman to frequent handling and fingering bilaterally and frequent pushing and pulling with the bilateral upper extremities to address his elbow pain and issues holding onto items. (Id. at 20, R. 19). In challenging this finding, Herman has failed to explain why the ALJ's determination in this regard was error.

Based on the foregoing, the Undersigned finds that the ALJ's evaluation of Dr. Gatton's opinion and determination that it should be given little weight is based upon substantial evidence and recommends that the Court deny the Plaintiff's request for remand on this issue.

While the Plaintiff seemingly attempts to assert other issues in his brief with regard to the ALJ's RFC assessment, the Undersigned finds these arguments are either undeveloped or lack any citations to authority. "Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." *M.G.*

23

*Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency*, 845 F.3d 313, 321 (7th Cir. 2017).

## B. Credibility Determination

Herman also argues that the ALJ did not properly evaluate his credibility as required by Social Security Ruling 16-3p. (Dkt. 10 at 6). "In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p and articulate the reasons for the credibility determination." *Karen A.R. v. Saul*, No. 1:18-cv-2024-DLP-SEB, 2019 WL 3369283, at *5 (S.D. Ind. July 26, 2019). SSR 16-3p describes a two-step process for evaluating a claimant's subjective symptoms.[7] First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *3 (S.S.A. Oct. 25, 2017). Second, the ALJ must evaluate the intensity and persistence of a claimant's symptoms such as pain and determine the extent to which they limit his ability to perform work-related activities. *Id.* at *3-4.

A court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal quotation marks and citation omitted). An ALJ must justify her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build "an accurate and

---

[7] SSR 16-3p became effective on March 28, 2016, (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *2, replacing SSR 96-7p, and requires an ALJ to assess a claimant's subjective symptoms rather than assessing his "credibility." By eliminating the term "credibility," the SSA makes clear that the "subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2016 WL 1119029 at *1. The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges are not in the business of impeaching a claimant's character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

logical bridge between the evidence and the conclusion." *Villano,* 556 F.3d at 562. An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Ultimately, the ALJ must explain her subjective symptom evaluation in such a way that allows the Court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted). Thus, "[a]s long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

When assessing a claimant's subjective symptom allegations, the ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8. In conducting her analysis, the ALJ cannot disregard a claimant's subjective complaints solely because of the "absence of objective medical corroboration." *Ghiselli v. Colvin*, 837 F.3d 771, 777 (7th Cir. 2016). The ALJ must also look to the other SSR 16-3p factors to determine if the claimant's subjective complaints are credible. *Villano*, 556 F.3d at 562. Here, the Plaintiff maintains that the ALJ erred when assessing his symptom testimony by focusing "erroneously [only] on the objective evidence." (Dkt. 10 at 6).

During his disability hearing, Herman testified that he experienced constant pain in his back and sporadic sharp pains in his arms when lifting, pushing, and pulling heavy objects, such as a gallon of milk or a metal door. (Dkt. 7-2 at 48, 52, 55, R. 47, 51, 54). Herman testified that over time he had abandoned certain hobbies, such as playing his guitar, because he could no longer lift the thirteen-pound instrument. (Id. at 47, R. 46). When discussing his activities of daily living, Herman further testified that he could prepare food for himself, independently meet his personal care needs, and that he maintained the ability to assist his father and stepmother with some household chores. (Id. at 40, R. 39). Herman stated that although he could run errands for himself, he limited those errands to once a month. (Id. at 48, R. 47). Herman also testified that he did not drive due to elbow pain, which caused his fingers to lock up and restricted his ability to grasp objects. (Id. at 47-48, 53, R. 46-47, 52). As to physical activities, Herman testified that, on average, he could sit for about thirty minutes or stand for about thirty to forty minutes. (Id. at 49, R. 48). He further stated that he could walk approximately half a block, but would need to sit or lay down for an hour or two to allow his legs and back to recover. (Id. at 49-50, R. 48-49). Herman further testified that he sometimes experienced shooting pain in his right leg when he walked. (Id. at 55-56, R. 54-55). Herman also testified that he typically slept about four hours per night and spent most of his days laying down, often while "watching television or something." (Id. at 50, R. 49). While Herman testified that he had taken pain medications and received elbow injections, he testified that they had not helped. (Id. at 50, 54, R. 49, 53). Herman stated that

he wore an elbow brace almost daily and a back brace when he moved around, although when his back began to hurt, he would lie down. (Id. at 42, R. 41).

ALJ Dietz found that Herman's subjective symptom allegations were "not entirely consistent with the medical evidence and other evidence in the record." (Dkt. 7-2 at 22, R. 21). In making this finding, the ALJ considered various SSR 16-3p factors, including the mild objective findings in the medical records, the medical opinions of the state agency physicians, Herman's functional limitations, the course of treatment that Herman underwent for back and elbow pain, and the medication prescribed. Because the ALJ did not rely solely on the lack of substantiation in the objective medical evidence to reject the extent of Herman's subjective allegations, but supported her decision with specific reasons reinforced by the record, Herman has not shown that the ALJ's subjective symptom evaluation was patently wrong.

"The ALJ is entitled to discount a claimant's symptom testimony where it is not well supported by the objective medical evidence or where it conflicts with the claimant's prior statements to medical providers. *Meeks v. Saul*, No. 1:19-cv-530-SLC, 2020 WL 4530045, at *6 (N.D. Ind. Aug. 5, 2020); *see Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *Arnold*, 473 F.3d at 823. In making her adverse subjective symptom finding, the ALJ first noted the objective medical evidence. The ALJ noted the radiographic evidence of degenerative disc disease and facet hypertrophy in Herman's lumbar spine. (Dkt. 7-2 at 21, R. 20). The ALJ also noted that the x-rays of Herman's elbows were unremarkable. (Id). The ALJ further noted the normal range of motion in Herman's lumbar and cervical spine, normal fine

fingering and gross gripping, and his ability to extend and flex both elbows during his physical examination. (Id). The ALJ found the objective evidence to support some limitations, however, "not to such a degree that . . . prevented [Herman] from performing work at the light exertional level . . . . " (Id. at 22, R. 21).

Next, the ALJ properly considered the "inconsistencies between [Herman's] statements and the rest of the medical evidence." (Dkt. 7-2 at 22, R. 21). Herman testified that he suffered from back, leg, and elbow pain. He managed this pain by lying down most of the day watching television, and he also limited himself to running errands once a month. (Dkt. 7-2 at 48, 52, 55, R. 47, 51, 54). When questioned about his daily activities, Herman testified that he sometimes walked to the Post Office which was about a half block from his house and that he went grocery shopping once a month. (Id. at 48, R. 47). Later, however, when the ALJ specifically asked Herman how far he could walk before he needed to stop, Herman indicated a half a block with a one to two-hour break. (Id. at 49, R. 48). Demonstrating the inconsistency in this line of testimony, the ALJ later asked Herman, "[i]f you walk to the Post Office, and you kind of take a break. How long is it before you can head back home?" (Id). Without indicating a need for a break, Herman stated that he could "head back home . . . but as soon as [he got] home, [he would] sit down." (Id).

During his consultative examination, Dr. Gatton found that Herman had a "normal range of motion in his lumbar and cervical spine," that he "walked with a normal gait," and that his "fine fingering and gross gripping were normal" in both hands. (Dkt. 7-2 at 21, R. 20). And, when speaking with his pain management

specialist, Dr. Turnak, in January 2018, Herman informed her that he had only experienced shooting pain in his leg on one day. (Dkt. 7-10 at 5, R. 395). Even though Herman testified that he did not drive because his hands and fingers lock up; that he sometimes experienced pain down the back of his legs when he walked; that he sometimes had difficulty pushing doors open due to pain in his arms; and that he was only able to lift a gallon of milk, the ALJ correctly noted that there was no objective medical evidence to support Herman's claims of "significantly limited range of motion, motor weakness, neurological deficits, or sensation loss . . . " (Id. at 22, R. 21).

In addition to the objective medical evidence, the ALJ also cited the medical opinions of the state agency physicians who found that Herman, with his functional limitations, "could perform work activity at the light exertional level." (Dkt. 7-2 at 22, R. 21). In giving his medical opinion, Dr. Brill considered Herman's subjective complaints of lower back pain and a burning sensation in his bilateral elbows. (Dkt. 7-3 at 4, 12, R. 67, 75). Dr. Brill also considered the medical records generated by Herman's consultative examination with Dr. Gatton, Dr. Drew's radiological examination of his lumbar spine, Herman's work history, and Herman's Adult Function Report. (Id. at 3-4, 11-12, R. 66-67, 74-75). Dr. Brill concluded that Herman could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight hour workday; sit for a total of six hours in an eight hour workday, and push and pull for an unlimited time. (Id. at 6, 14, R. 69, 77). Dr. Brill also found no manipulative, visual, communicative, or

environmental limitations. (Id. at 6-7, R. 69-70). On review, Dr. Eskonen noted more recent medical evidence, including Dr. Marsteller's findings regarding Herman's posterior and paravertebral muscle insertion tenderness; paravertebral muscle spasm; pain with spine hyperextension; elbow tenderness which worsened with wrist extension; and the referral to orthopedics. (Id. at 34, R. 97). On review, Dr. Eskonen found that the medical evidence supported Dr. Brill's finding, (Id. at 24, 34, R. 87, 97), and that Herman, with his functional limitations, retained the ability to perform light work. (Id. at 28, 38, R. 91, 101). The ALJ gave the state agency reviewing physicians' medical opinions great weight, explaining that their opinions were supported by substantial evidence in the record. (Dkt. 7-2 at 22, R. 21).

The ALJ was entitled to discount Herman's symptom allegations because they were inconsistent with his own testimony at the hearing, the objective medical evidence, and the state agency physicians' medical opinions. *See Murphy v. Berryhill*, 727 F. App'x. 202, 207 (7th Cir. 2018) (ALJ's adverse credibility finding was "properly based on the incongruity between the relatively modest symptoms [the claimant] reported to her doctors and the more severe symptoms [claimant] . . . reported to the ALJ."); *Powers v. Apfel,* 207 F.3d 431, 435-36 (7th Cir. 2000) ("The discrepancy between the degree of [symptoms] attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition."). Considering all the evidence, the ALJ's decision to discount Herman's subjective symptom testimony based on inconsistences in the record and medical opinions from the relevant period is supported by substantial evidence.

Further, the ALJ cited other reasons to support her finding that Herman's allegations were not entirely credible. In addition to the lack of objective evidence and inconsistences, the ALJ also cited Herman's course of treatment as part of her subjective symptom analysis. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (refusing to question ALJ's finding that claimant's course of treatment consisting of various pain medications, several injections, and one physical therapy session was "relatively conservative" when affirming the ALJ's decision). Here, the ALJ highlighted the general medication management by Herman's practitioners and his physical therapy sessions. The ALJ considered Herman's medications, which included Lidocaine patches for his elbows, injections, and bilateral medial branch blocks, and pointed to Herman's reporting that these medications offered some relief. (Dkt. 7-2 at 22, R. 21). Although Herman takes issue with the ALJ's statement that he did not receive "the type of medical treatment one would expect for a totally disabled individual," (Dkt. 10 at 6; *see* Dkt. 7-2 at 22, R. 21), the regulations expressly permit the ALJ to consider a claimant's treatment history when assessing a claimant's subjective symptom statements. 20 C.F.R. § 404.1529(c)(3)(v).

Finally, the Plaintiff argues, in a two-sentence challenge, that the ALJ improperly discredited a third-party statement from his stepsister, Theresa Bryant. (Dkt. 10 at 6-7; *see* Dkt. 7-7 at 41, R. 267). Because this argument is perfunctory and undeveloped, and not supported by pertinent authority, the Court should deem it waived. *Warner v. Astrue*, 880 F. Supp. 2d 935, 945 (N.D. Ind. 2012). Though the Plaintiff references other arguments regarding the credibility determination and

makes additional perfunctory statements of error on these matters, the Undersigned recommends that these arguments also be deemed waived.

Given the adequate reasons supported by the record for discounting Herman's allegations of limitations, the Undersigned recommends that the Court decline to disturb the ALJ's credibility finding and deny remand on this issue. *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Pepper*, 712 F.3d at 367.

## C. Remaining Arguments

Finally, the Plaintiff asserts that the ALJ erred at Step Five, stating:

> The ALJ cited to jobs claimant allegedly could perform. This is an error if Plaintiff was limited to sedentary work, as he has already showed via the above. Further, the sit/stand options Plaintiff would require would be considered an accommodation, as it is not offered to all, and would therefore reduce the number of jobs available at any level of exertion. This issue requires remand for further administrative proceedings.

(Dkt. 10 at 7). This, however, is the extent of Plaintiff's argument. As mentioned above, the Court should find this argument perfunctory and undeveloped and, thus, waived. *Crespo*, 824 F.3d at 673-74. Even if the argument is not waived, the Court should conclude that the ALJ appropriately supported her decision to limit Plaintiff to light work, rendering this final argument moot.

## V.    CONCLUSION

For the reasons detailed herein, the Undersigned recommends that the Court **AFFIRM** the ALJ's decision denying Plaintiff benefits.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure to timely file

objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

So ORDERED.

Date: 9/2/2020

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email.